**ICE MILLER LLP**
Louis. T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
1500 Broadway, Suite 2900
New York, NY 10036
Phone: (212) 835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

*Counsel to AIRN Liquidation Trust*
*Co., LLC, in its capacity as Liquidation Trustee*
*Of the AIRN Liquidation Trust*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC, *et al*.,[1]<br><br>         Debtors. | Chapter 11<br><br>Case No: 22-14539-JKS<br><br>(Jointly Administered) |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>         Plaintiff,<br><br>v.<br><br>MEHREEN SHAH a/k/a MONA SHAH, MONA SHAH & ASSOCIATES, PLLC, REBECCA SAVITA SINGH, GRAVITAS NYC REGIONAL CENTER, LLC f/k/a NYC TRANSPORTATION REGIONAL CENTER, NRIA EB5 BERGENLINE FUND, LLC, NRIA EB5 1300 MANHATTAN FUND, LLC and JOHN DOES 1-100.<br><br>         Defendants. | Adv. Pro. No. 23-_____-JKS |

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA.

## COMPLAINT

AIRN Liquidation Trust Co., LLC (the "Liquidation Trustee" or "Plaintiff"), in its capacity as Liquidation Trustee of the AIRN Liquidation Trust established pursuant to the *First Amended Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* ("Plan") [Docket No. 3256] and the order confirming the Plan (the "Confirmation Order"), which has been assigned and, as of the Effective Date of the Plan, holds the claims of Contributing Investors (as that term is defined herein and in the Plan), by and through its undersigned counsel, brings this complaint (the "Complaint") against the above-captioned Defendants and hereby alleges as follows:[2]

## NATURE OF THE COMPLAINT[3]

1.      This action seeks to recover millions of dollars in damages as a result of an illegal scheme perpetrated by Defendants, who preyed upon individuals seeking permanent residency status through the United States EB-5 Immigrant Investor Program. Defendants Mehreen Shah, a/k/a Mona Shah ("Shah") and Rebecca Savita Singh ("Singh"), managing partner and partner, respectively, of the law firm Mona Shah and Associates PLLC ("MSA Law") (collectively, "Defendants") promote themselves as "leading practitioners in the field of EB-5 Immigrant Investor Business Immigration." *See*, *About Us*, MONA SHAH & ASSOCS. GLOB. https://mshahlaw.com/about/ (last accessed Dec. 5, 2023).

2.      As set forth in greater detail throughout this Complaint, under the guise of providing legal services, Defendants raised at least $8.5 million in investments through a series of

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

[3] The allegations in this Complaint are based upon the documents and information available to Plaintiff at the time of this filing and are subject to clarification, amendment, revision, or other modification in light of new documents and information obtained through subsequent discovery in this action, in the underlying Chapter 11 cases, or otherwise.

unregistered securities offerings from seventeen (17) foreign national investors (collectively, the "Foreign National Investors") seeking unconditional permanent residency status in the United States via the United States EB-5 Immigrant Investor Program ("EB-5 Program").[4] Fifteen of those foreign national investors signed engagement letters with MSA Law (collectively, the "Engagement Letters"). On information and belief, each of the Foreign National Investors believed that MSA Law, and its attorneys Shah and Singh, represented their best interests in investing a significant sum of money into the U.S. economy in exchange for the opportunity to become permanent residents of the United States. In reality, as will be set forth in more detail below, Shah and Singh, through MSA Law, used their asserted position of power as EB-5 experts to prey on Foreign National Investors in coordination with National Realty Investment Advisors, LLC ("NRIA") and its affiliated entities (collectively "Debtors").

3.      As a result of Defendants' misconduct described herein, the funds invested by the Foreign National Investors were not maintained in bank accounts of the EB-5 companies, nor were they maintained in accounts segregated and earmarked for the project specified on their EB-5 application for unconditional permanent residency. Rather, once the Foreign National Investors' funds were received in escrow, they were transferred to an account in the name of either Bergenline Capital 4901 or Manhattan Avenue Capital 1300 LLC , and then almost immediately transferred to NRIA's operating account, comingled with the funds of other investors, used to fund distributions to other investors, used to fund media advertisements (touting guaranteed returns to bring in new investors), and to pay NRIA's expenses, including commissions and kickbacks to

---

[4] This is not the first time that Shah and MSA have been charged with securities violations stemming from their EB-5 operations. Just last month, on November 21, 2023, the Securities and Exchange Commission filed a complaint (the "November 21, 2023 SEC Complaint") against Shah and MSA Law asserting various securities violations stemming from unrelated EB-5 offerings. *See generally* Complaint, *Sec. and Exchange Comm'n v. Nadim Ahmed a/k/a Nadim Khan et al.*, Case No. 23-cv-10210 (S.D.N.Y 2023).

Mona Shah and her companies. To date, United States Citizenship and Immigration Services ("USCIS") has not granted any of the Foreign National Investors permanent residency status.

4.    Under the EB-5 Program, foreign national investors are eligible for permanent residency status in the United States through a qualifying investment in a new commercial enterprise in the United States that will create a certain number of permanent full-time jobs for qualified U.S. workers. Prior to November 21, 2019, the minimum investment amount for investors seeking to invest in a new commercial enterprise that would be principally doing business in a Targeted Economic Area (TEA), was $500,000. Given the timing of the investments at issue, the minimum investment for each of the EB-5 offerings described herein was $500,000.

5.    Although Mona Shah extorts her EB-5 expertise, she—and the companies she operates and controls—have been singled out by the Securities and Exchange Commission ("the SEC") for violations of federal securities laws in connection with her EB-5 related securities offerings.

6.    On March 5, 2018, the SEC issued an administrative order[5] that, among other matters, made findings and imposed remedial sanctions and a cease and desist order against Edwin Shaw, LLC ("Edwin Shaw"), a company co-owned by Mona Shah.[6] The SEC ordered Edwin Shaw to pay a total of $544,744 in disgorgement, prejudgment interest, and civil monetary penalty. As detailed in the SEC's March 5, 2018 findings:

a.    From April 2014 to March 2017, Edwin Shaw, through a principal of the company, identified and facilitated purchases of EB-5 investments by selling LLC Membership Interests to more than 30 foreign investors;

---

[5] In the Matter of Edwin Shaw, LLC, Exchange Act Release No. 82805 (Mar. 5, 2018).
[6] In the November 21, 2023 SEC Complaint, *see supra* n. 4, Mona Shah is described as the co-owner of Edwin Shaw, LLC. *See* Complaint at 18, *Sec. and Exchange Comm'n v. Nadim Ahmed a/k/a Nadim Khan et al.*, Case No. 23-cv-10210 (S.D.N.Y 2023) (" . . . In March of 2018, Edwin Shaw LLC, . . . an entity owned by Ahmed and Shah, reached a settlement with the Commission . . .").

    b.   The Edwin Shaw Principal negotiated an administrative fee ranging from $5,000 to $50,000 paid to the Managing Member of the LLC;

    c.   The Managing Member issued checks to Edwin Shaw for Edwin Shaw's services in effecting the sale of the LLC Membership units; and

    d.   Edwin Shaw willfully violated Section 15 (d)(1) of the Exchange Act by acting as an unregistered broker or dealer with the SEC.

*In the Matter of Edwin Shaw, LLC,* Exchange Act Release No. 82805 (Mar. 5, 2018).

7.     In the November 21, 2023 SEC Complaint, the SEC alleges, as to one of the securities offerings described therein, that from June 2014 to December 2018, Mona Shah, MSA Law, and her co-defendant in that matter, offered and sold approximately $49.5 million of securities in an unregistered, nonexempt securities offering, NYC Green, to at least ninety-nine (99) investors seeking unconditional permanent residency via the EB-5 Program. As with the NRIA EB-5 offerings, each foreign investor invested $500,000 and was charged an additional administrative fee. Also, as with the NRIA EB-5 offerings, *USCIS has not approved any NYC Green investor for unconditional permanent residency* pursuant to the EB-5 Program based on their investment in the NYC Green offering.

8.     Nevertheless, Defendants concealed from the Foreign National Investors that Edwin Shaw, a company that Shah co-owned, had settled allegations of federal securities violations in March of 2018, just prior to her NRIA EB-5 Program activities, and significantly, that none of the more than ninety-nine (99) investors that Shah sold EB-5 securities to beginning in 2014 had been approved for permanent residency under the EB-5 Program.

9.     Rather, in order to enrich themselves, Defendants continued their long-established pattern of activity described above, this time in cooperation with Thomas Nicholas Salzano, a/k/a Nick Salzano ("Salzano") and NRIA. Even though Defendants had a responsibility to conduct due diligence, they failed to do so. For example, they ignored red flags, such as NRIA's extraordinarily

high guaranteed returns. And, upon information and belief, Defendants did not otherwise conduct reasonable diligence in favor of the prospects of the impending economic benefits of an alliance with Salzano—NRIA's control person. Salzano had been the subject of a multi-million civil fraud actions brought by the Federal Trade Commission[7] and had been criminally prosecuted for a major fraud as recently as 2013.[8] By late 2018, NRIA's construction projects also had a demonstrated history of failure to timely perform, which Shah would have known had she completed reasonable diligence.

10.    Although Defendants raised money in the names of NRIA EB5 Bergenline Fund, LLC and NRIA EB5 1300 Manhattan Fund, LLC, the Foreign National Investor's funds did not come to rest with those entities nor did those investments come to rest with their companion job creating entities, (Bergenline Capital 4901, LLC was the job creating entity for Bergenline). Rather, the escrow agent released the Investors' funds to Bergenline soon after their receipt and those funds were almost immediately diverted to NRIA's operating account commingled with funds from other investors and other sources.[9] NRIA recorded the commingled Foreign National Investors' funds as long term liability on their books and records  and used the commingled funds to pay its expenses, including distributions and redemptions to other investors, commission

---

[7] In 2004, the Federal Trade Commission filed a complaint against him for his role in a fraudulent scheme involving NorVergence Inc. *See FTC Settles Court Case Against NorVergence Principals*, FED. TRADE COMM'N (June 26, 2006), https://www.ftc.gov/news-events/news/press-releases/2006/06/ftc-settles-court-case-against-norvergence-principals. A $50 million consent judgment was imposed on Salzano for his actions in that scheme. *Id.*

[8] *See* Complaint at 19, *Sec. and Exchange Comm'n v. Nat'l Realty Inv. Advisors, LLC, et. al.* No. 2:22-cv-06066 (D. N.J. 2022), at 19.

[9] By way of illustration, the NRIA EB5 Bergenline Fund, LLC signature bank escrow account #9593 received funds totaling $1.537MM from three foreign investors from  July 18 to July 29, 2019. On August 5, 2019, a total of $900,000 was transferred out of the account to Signature acct # 9648 and immediately wired out to a Bergenline Capital 4901 TD account. The next day the funds were wired into NRIA's TD operating account.  Another  $450,000 of Investor's funds was transferred out of the escrow account on August 16, 2019, immediately wired to the Bergenline Capital 4901 account the same day and then wired to NRIA's TD Bank operating account on the next business day.

payments to unregistered broker dealers, payments to insiders and more that was not disclosed to the Foreign National Investors.  NRIA paid the Regional Center a $5,000 fee from the comingled funds in its operating account upon receipt of each $450,000 investment in NRIA's operating account from Defendants. The commingling of the Foreign National Investors' investments heightened the risk of financial loss  and heightened the risk  that each Foreign National Investor's would be unable to demonstrate that their investments  went into the project specified in their EB-5 application to qualify them for residency. The commingled investor monies in NRIA's operating account were also used to pay NRIA's expenses including *payments of hundreds of thousands of dollars to Shah and her companies.*

11.    Notably, USCIS has not approved any of the NRIA EB-5 Program petitions, stating as grounds for denying one petition that the project described in the petition did not adhere to the proposed construction schedule and that major legal actions against management personnel and accusations of fraud existed, among other reasons.

12.    In short, and as will be set forth in detail below, Defendants operated a fraudulent business model whereby Foreign National Investors were unable to satisfy EB-5 capital investment thresholds because of actions by the Defendants. Unaware of the scheme, the Foreign National Investors placed their investment and prospective immigration benefits at risk as detailed *infra*. Importantly, Shah and Singh were the architects of this scheme, which financially benefitted them in excess of $900,000.[10] MSA Law, Shah, and Singh charged each Foreign National Investor an administrative fee of up to $50,000 that was due and paid at the time of the Foreign National Investor's investment. MSA Law, Shah, and Singh also charged the following fees:

---

[10] This figure includes the payments made from NRIA to Shah and her entities.

a.      One-time regional center affiliation fee of $14,000 or $15,000 depending on the NRIA project;

b.      One-time $5,000 administrative fee per Foreign National Investor;

c.      Annual per Foreign National Investor fee of 3% or 1.5% of total EB-5 capital raised; and

d.      Per Foreign National Investor regional center administrative fee.

13.     The above-listed sources of funds do not include the legal fees paid by NRIA and the Foreign National Investors to MSA Law, Shah, and Singh, which amount to over $230,000.

14.     Specifically, on information and belief, MSA Law, Shah, and Singh participated in a "kickback" scheme whereby they would receive per Foreign National Investor annual commissions from NRIA to be paid from accounts in which the Foreign National Investors' $500,000 minimum investment amount was deposited. On information and belief, in diverting funds out of the minimum investment amount, Shah and Singh knowingly and, in contravention of EB-5 regulations, improperly reduced the minimum investment required under the EB-5 Program despite representing to Foreign National Investors that they "do not collect any commission fees from any of the projects, though we have been paid for the preparation of the documents." In other words, payment of these fees to Shah from the minimum investment amount improperly reduced the minimum investment. *See* chain of emails between a potential foreign national investor, including Aug. 5, 2019 email at **Exhibit B;** *compare to* Oct. 8, 2019 email from Salzano stating how fees will be paid:

8

**From:** Nicholas Salzano <nicholas@nria.net>
**Sent:** Tuesday, October 8, 2019 21:26
**To:** Hermione <hermione@mshahlaw.com>; Glenn La Mattina <GLaMattina@nria.net>; mona
<mona@mshahlaw.com>
**Cc:** shagufta <shagufta@mshahlaw.com>; Rebecca <rebecca@mshahlaw.com>
**Subject:** RE: RE: Agreement

one more note, we will not require a change in the release rate from Signature with your RC involved. we will keep
it at 90% release just like bergenline - so that your 3% annual fees are already more or less set aside.

15.     In addition to immigration benefits, Defendants misrepresented that the Foreign

National Investors would receive extraordinarily high, and objectively unreasonable, guaranteed

returns; and that the Foreign National Investors would be paid their return of capital first when, in

fact, NRIA operated like a Ponzi scheme, namely, the redemption of investor funds was done so

with other investor funds. In doing so, Defendants aided in the Ponzi scheme described below in

¶¶ 38–52.

16.     MSA Law, Shah, and Singh structured, operated, offered, and sold securities to the

Foreign National Investors in the form of interests in NRIA EB5 Bergenline Fund, LLC

("Bergenline") and NRIA EB5 1300 Manhattan Fund, LLC ("1300 Manhattan") (collectively, the

"NRIA Projects"), which Defendants misrepresented would meet the minimum requirements for

qualifying investments in the EB-5 Program. The Foreign National Investors' funds were then

invested with NRIA itself. Shah is the managing member of Bergenline.

17.     MSA Law, Shah, and Singh also claimed to assess investor eligibility for the EB-5

Program, purportedly by reviewing a questionnaire completed by each Foreign National Investor.

However, at least one of those completed questionnaires indicates that the Foreign National

Investor was not in fact accredited, thereby suggesting that any review completed was cursory and

incomplete.

18.     Simultaneous to its legal representation of the Foreign National Investors in the preparation and filing of EB-5 petitions and counseling regarding the investment under the EB-5 Program, MSA Law was retained by NRIA to provide legal services related to the foreign national investment in the NRIA Projects. Recognizing the inherent conflict of interest, MSA Law, Shah and Singh included in their Engagement Letters with the Foreign National Investors a provision whereby the Foreign National Investors waived the conflict, but as Shah and Singh know (or should have known), such conflicts are not waivable. *See* N.Y. R. Pro. Conduct 1.7 (setting forth the conflict of interest rules for current clients); *see also* NYSBA Opinion 1086 (Mar. 7, 2016) ("An attorney may not accept a fee or commission from an investment firm for referring the client to such firm where the money to be invested arises from an engagement in which the lawyer represented the client because the fee creates a non-consentable conflict.").

19.     MSA Law, Shah, and Singh, structured and operated the Gravitas NYC Regional Center f/k/a New York City Transportation Regional Center (the "Regional Center") to manage the foreign national investments made in the NRIA Projects. Shah is the managing member of the Regional Center.

20.     MSA Law, Shah, and Singh, in coordination with NRIA, set up the Regional Center to manage the foreign national investments, established the NRIA projects in which foreign nationals invested, prepared relevant offering documents, escrow agreements, private placement memoranda, and other documents related to the investment opportunity, and assisted other parties associated with the investment projects.

21.     MSA Law, Shah, and Singh were the principal drafters of the Bergenline offering documents including, but not limited to, the Private Placement Memorandum which required a minimum capital contribution of $500,000 and one-time administrative fee up to $50,000 from

"investors desiring to participate in the Employment Based Fifth Preference Immigrant Visa Program." *See* Bergenline Private Placement Memorandum at **Exhibit C**.

22.     MSA Law, Shah, and Singh were the principal drafters of the 1300 Manhattan offering documents including, but not limited to, the Confidential Offering Memorandum which required a minimum capital contribution of $500,000 and one-time administrative fee up to $50,000 from investors. The Company "was formed to make investments through the United States EB-5 immigrant investor program." *See* 1300 Manhattan Confidential Offering Memorandum at **Exhibit D**.

23.     MSA Law, Shah, and Singh were the principal drafters of the Bergenline Regional Center Sponsorship Agreement ("Sponsorship Agreement") between the Regional Center, Bergenline and NRIA, whereby the Regional Center was paid a one-time affiliation fee of $15,000, administrative fees of $5,000 per investor, and annual fees of 3% of the total EB-5 capital raised in relation to the Bergenline foreign national investment.  *See* Bergenline Regional Center Sponsorship Agreement at **Exhibit E**.

24.     MSA Law, Shah, and Singh were the principal drafters of the 1300 Manhattan Regional Center Sponsorship Agreement ("Sponsorship Agreement") between the Regional Center, 1300 Manhattan and NRIA, whereby the Regional Center was paid a one-time affiliation fee of $14,000, administrative fees of $5,000 per investor, and annual fees of 1.5% of the total EB-5 capital raised in relation to the 1300 Manhattan foreign national investment. *See* 1300 Manhattan Regional Center Sponsorship Agreement at **Exhibit F**.

25.     From approximately September 2018 through December 2019, Defendants filed EB-5 Immigrant Investor petitions with USCIS on behalf of the foreign national investors.

26.    The Foreign National Investors paid legal fees to MSA Law, Shah, and Singh for honest and competent representation with respect to investment advice and the preparation and filing of EB-5 petitions in order to obtain legal permanent residency status in the United States but received neither.

27.    Unbeknownst to the Foreign National Investors, Defendants were engaged in aiding a Ponzi scheme orchestrated by NRIA and described more fully below at ¶¶ 51–68.

28.    The Liquidation Trustee brings this action seeking entry of a judgment, among other things: (i) avoiding and recovering fraudulent transfers pursuant to 11 U.S.C. §§ 544, 548, 550, N.J.S.A. §§ 25:2-25, 25:2-27 and applicable law; (ii) compelling Defendants to provide an accounting of all funds or property transferred and payments made to them by or for the benefit of the Defendants prior to the Petition Date; (iii) granting the Liquidation Trustee equitable relief as requested herein; and (iv) granting the Liquidation Trustee such other and further relief as may be just and proper.

## JURISDICTION AND VENUE

29.    The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a), and the *Standing Order*, dated July 23, 1984, referring all cases under the Bankruptcy Code to the bankruptcy judges for this District, as amended on September 18, 2012. Standing Order of Reference 12-1 (Simandle, C.J.).

30.    The claims asserted in this adversary proceeding are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

31.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

32.    Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), this adversary proceeding relates to the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases") of the Debtors.

33.    This Court has personal jurisdiction over the Defendants consistent with the Constitution and laws of the United States, as well as Bankruptcy Rule 7004(f) and other applicable law.

34.    Pursuant to Bankruptcy Rule 7008, Liquidation Trustee consents to the entry of final orders or judgments by this Court, in the event it is determined that this Court cannot do so consistent with Article III of the United States Constitution absent the consent of the parties.

35.    The statutory and legal bases for the relief requested in this Complaint are sections 105(a), 544, 548, 550, and 551 of the Bankruptcy Code, Bankruptcy Rule 7065, and applicable state law, including N.J.S.A. 25:2-25, and N.J.S.A.  25:2-27, and N.J.S.A. 49:3-52, and N.J.S.A. 49:3-71.

## PARTIES

36.    Plaintiff is the Liquidation Trustee of the AIRN Liquidation Trust established pursuant to the Plan and the Liquidation Trust Agreement approved by the Confirmation Order.

37.    Pursuant to Article IV.F of the Plan, the Liquidation Trustee holds and retains all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or Estates' Causes of Action (whether existing as of the Petition Date or thereafter arising), including all Avoidance Actions and Contributed Claims and Liquidation Trust Actions, as each of those terms is defined in the Plan. In addition, the Liquidation Trustee holds the claims of Contributing Investors (as that term is defined herein and, in the Plan,).

13

38.    Defendant Mehreen Shah, a/k/a Mona Shah ("Shah") is a resident of New York and at all times relevant was an attorney licensed in New York and the United Kingdom and the managing partner of Mona Shah & Associates, PLLC.

39.    Defendant Rebecca Savita Singh ("Singh") is a resident of New York and at all times relevant was an attorney licensed in New York and a partner at Mona Shah & Associates, PLLC.

40.    MSA Law is a law firm and New York professional service limited liability company, organized in 2014, with its principal place of business at 232 Madison Avenue, New York, New York 10016.

41.    NRIA EB5 Bergenline Fund, LLC, is a New Jersey limited liability company whose principal place of business is 232 Madison Avenue, New York, New York 10016. NRIA EB5 Bergenline Fund, LLC filed proofs of claim against multiple Debtors all in the same amount of $7,583,000.

42.    NRIA EB5 1300 Manhattan Fund, LLC, is a Delaware limited liability company registered to do business in New Jersey whose principal place of business is 1325 Paterson Plank Road, Secaucus, New Jersey. Notably, NRIA's prior address was 1325 Paterson Plank, Secaucus, New Jersey 07094.

43.    The Regional Center, a New York limited liability company, was organized in 2014, and shared a principal place of business with MSA Law at 232 Madison Avenue, New York, New York. Shah is an owner and managing member of the Regional Center. The Regional Center is and at all relevant times has been the manager, managing member, and sponsor of NRIA EB5 Bergenline Fund, LLC.

44.     To this day, MSA Law holds itself out to the public as being made up of a "team" that "successfully use[s] their expertise in structuring, configuring, and preparing numerous EB-5 projects." *Mona Shah & Associates Global*, MONA SHAH & ASSOCS. GLOB., https://mshahlaw.com/ (last accessed Dec. 5, 2023). Similarly, Shah's own entry on MSA Law's website describes her as being "highly proficient and recognized as an industry leader in EB-5 law[.]" *Mona Shah, Esq.*, MONA SHAH & ASSOCS. GLOB., https://mshahlaw.com/mona-shah-esq/ (last accessed Dec. 5, 2023). Singh's entry describes her as having "12+ years of experience in the EB-5 Industry" and as being "an advanced EB-5 practitioner." *Rebecca S. Singh, Esq.*, MONA SHAH & ASSOCS. GLOB., https://mshahlaw.com/rebecca-s-singh-esq/ (last accessed Dec. 5, 2023).

45.     On information and belief, John Does 1-100 include, among others, initial and subsequent transferees of one or more of the Fraudulent Transfers and/or their respective affiliates, successors, or assigns.

## **BACKGROUND**

### A. Overview of the Chapter 11 Cases

46.     On June 7, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

47.     The Chapter 11 Cases are jointly administered pursuant to the *Order (A) Directing Joint Administration of Chapter 11 Cases and (B) Granting Related Relief* [Docket No. 27], entered on June 9, 2022.

48.     Following several months of negotiations, on April 11, 2023, the Debtors and the Official Committee of Unsecured Creditors (the "Committee") filed the *Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* [Docket No. 228] and the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Liquidation for*

*National Realty Investment Advisors, LLC, et al.* [Docket No. 2229] (the "Disclosure Statement"), which was approved by the Court on May 18, 2023 [Docket No. 2556].

49.     Additional information about the Debtors' business, capital structure, and the events leading up to the commencement of these Chapter 11 Cases can be found in the Disclosure Statement.

50.     Following the confirmation hearing held on August 1, 2023, on August 10, 2023, the Court entered the Confirmation Order [Docket No. 3599].

**B. NRIA's Business Structure—The Ponzi Scheme**

51.     NRIA is a Delaware limited liability company that was formed on November 27, 2006, by Salzano and Rey E. Grabato II ("Grabato"). NRIA's principal place of business was located at 1 Harmon Plaza, Floor 9, Secaucus, New Jersey 07094.

52.     Grabato was the purported majority owner, President, and the Chief Executive Officer of NRIA.

53.     Salzano allegedly served as a "Senior Independent Executive Advisor and Portfolio Manager" of NRIA, although his involvement in the company was more akin to a President or chief executive officer until he was removed in October 2021.

54.     Salzano, Grabato and their co-conspirators operated the Debtors as a massive international Ponzi scheme. As part of this fraudulent scheme, the Debtors' leadership team, including Salzano, and their co-conspirators, used the Debtors to solicit over $600 million in investments from approximately 2,000 unsuspecting investors (collectively, the "Investors"). Three hundred and eighty-two Investors were retirees who contributed more than $94.8 million from hard-earned retirement accounts.

55.     NRIA claimed to operate as a real estate investment, management, and development firm that, since its inception, had developed dozens of luxury properties in Florida, New York, New Jersey, and Pennsylvania. NRIA also claimed that it would pay extraordinarily high guaranteed returns to its investors, and that its investors would be paid their return of capital first. In reality, Salzano, Grabato, and others, by and through NRIA, operated like a Ponzi scheme, using Investors' own contributions to pay investor distributions, to orchestrate an extensive marketing effort to attract new investors, and to divert funds and pay the personal expenses of Salzano, Grabato, their family members, and others. And any actual profits, if any, were not allocated in full to investor returns as promised, but instead went to Salzano, Grabato, their family members, and countless other individuals and entities.[11]

56.     Beginning in 2016, Salzano, Grabato, and others, by and through NRIA, offered investors interests in a series of limited liability companies (the "Pre-Fund LLCs") developing real estate properties. Initially, each of the Pre-Fund LLCs purportedly held a single investment property, and NRIA represented to each investor which property the Investors were investing in and from which property the Investors would purportedly receive profits. U. S. Construction,  a company co-owned by Salzano's son offered fixed price construction contracts and fast build guarantees that were included in the offering documents for most of the LLC's. NRIA, by contract with the Pre-Fund LLC's managing member, guaranteed to repurchase the property within a stated period, often 18 months, at a price adequate to pay off all lenders and provide the stated guaranteed returns to the Pre-Fund LLC's investors. Many of the Pre-Fund LLCs also represented that the investors would receive monthly distributions of as much as 12% until the property is sold.

---

[11] *See generally* Complaint, *Sec. and Exchange Comm'n v. Nat'l Realty Inv. Advisors, LLC, et. al.* No. 2:22-cv-06066 (D. N.J. 2022)

However, the properties were not built timely, NRIA did not buy back the properties and distributions to investors that had been paid from the commingled funds in NRIA's operating account ceased.

57.     On February 5, 2018, Salzano, Grabato, and Arthur S. Scutaro a/k/a Arthur Scutaro ("Scutaro"), with the assistance, participation and in collaboration with others, formed NRIA Partners Portfolio Fund I LLC (the "Fund"). A principal goal of the Fund was to "roll up" pre-existing Investors in individual property LLCs into one pooled fund rather than purchase the properties and repay investors the guaranteed returns, and to solicit investments from additional investors. The creation of the Fund eliminated the obligation for NRIA to buy back property from the Pre-Fund LLCs and created the opportunity to distribute cash to Pre-Fund Investors from new Investors' money. It also made it more difficult for Investors to track the progress on any particular property in which they were invested and the profits supposedly flowing therefrom.

58.     From the Fund's inception in 2018, until at least January 2022, NRIA raised more than $600 million for the Fund from approximately 2,000 Investors. Three hundred and eighty-two Investors were retirees who contributed more than $94.8 million from hard-earned retirement accounts. Because neither NRIA nor the Fund generated enough cash from operations to cover distributions made to Investors, NRIA manipulated the Fund's financial statements and financial information included within marketing materials to mislead Investors.

59.     In short, Salzano, Grabato and others, used NRIA to perpetuate their Ponzi scheme.

60.     Investors believed that their investments were being used to fund the purchase and development of real estate. In reality, the bulk of the investments was funneled to insiders or used to pay NRIA employee excessive salaries and overhead expenses, including the advertising and marketing expenses necessary to bring in a continuing stream of new investors. More than $80

million was spent on advertising expense and another $100 million of the investor funds was used to pay "guaranteed" returns to other Investors.

61.     To keep the Ponzi scheme afloat, NRIA needed to continually receive substantial additional investor monies. Salzano and Scuttaro led and directed the marketing campaign, which employed deception, material misrepresentations and omissions, and falsified documents. None of the securities issued by the Debtors were registered, and the private placement memoranda issued to solicit investments failed to disclose substantial material facts that should have been disclosed to investors, including, for example, Salzano's true controlling position with the Debtors and his lengthy prior civil and criminal history.[12]

**C.  The Defendants' Roles in the Fraudulent Scheme**

62.     On or about May 2018, MSA Law was retained by NRIA to solicit investments in the Bergenline and 1300 Manhattan projects from Foreign National Investors through the EB-5 Program. MSA Law, Shah, and Singh's representation of NRIA included, but was not limited to, drafting legal documents, providing legal advice, marketing, solicitation, providing business services, and general management of EB-5 investments.

63.     MSA Law, Shah and Singh were heavily involved in drafting, amending, and finalizing project documents in coordination with NRIA. MSA Law, Shah, and Singh then invoiced NRIA for the provision of those legal services related to the EB-5 projects. *See* below screenshots detailing emails between NRIA and MSA Law regarding project documents; *see* correspondence from MSA Law to NRIA regarding an invoice for work related to the drafting of

---

[12] *See* New Jersey Bureau of Securities Summary Cease and Desist Order filed on June 21, 2022 [Docket No. 60].

an amendment to the Private Placement Memorandum ("PPM") and the drafting of other legal

documents for the Bergenline project at **Exhibit G**.

---

**From:** Marissa Prianti <marissa@mshahlaw.com>
**Sent:** Wednesday, October 31, 2018 3:35 PM
**To:** Nicholas Salzano <nicholas@nria.net>
**Cc:** mona <mona@mshahlaw.com>; Rebecca <rebecca@mshahlaw.com>
**Subject:** Bergenline PPM - Investor Version

Hi Nick,

Attached please find the PPM that can be shown to investors.

As I mentioned when we spoke, the only 6% I have changed is the NCE share, which I changed from from 5% to 6%.

When distributing the brochures, please be sure that investors are given the correct developer equity number. We will update the brochure so that the next batch printed will have the correct information.

I will provide the other offering documents as they are finalized.

Regards,

---

**From:** Marissa Prianti [mailto:marissa@mshahlaw.com]
**Sent:** Tuesday, October 09, 2018 10:42 AM
**To:** Nicholas Salzano; Coley O'Brien; Glenn La Mattina; Rey Grabato
**Cc:** mona; Rebecca
**Subject:** Bergenline PPM

Hello,

Attached please find a draft PPM for Bergenline.

As you go through the document, you will see that I have highlighted certain sections in green. Please look at these sections and confirm that they are factually correct.

Please ignore what is highlighted in yellow - these are just page and exhibit numbering issues that I will address.

Regards,

**From:** Glenn La Mattina <GLaMattina@nria.net>
**Sent:** Tuesday, July 2, 2019 17:07
**To:** shagufta
**Cc:** Rebecca; Hermione; mona; Nicholas Salzano; Vincent Scutaro; Art Scutaro
**Subject:** Re: MSA Inv#00995 for Bergenline Amended Offering Documents

Shagufta,

Can you please forward the copies of the work you have done for our review?

**From:** shagufta <shagufta@mshahlaw.com>
**Date:** Tuesday, July 2, 2019 at 11:03 AM
**To:** Glenn La Mattina <GLaMattina@nria.net>

**Cc:** Rebecca <rebecca@mshahlaw.com>, "hermione@mshahlaw.com"
<hermione@mshahlaw.com>, mona <mona@mshahlaw.com>, Nicholas Salzano
<nicholas@nria.net>, Vincent Scutaro <Vincent@nria.net>, Art Scutaro <ascutaro@nria.net>
**Subject:** MSA Inv#00995 for Bergenline Amended Offering Documents

Dear Glenn:
Attached is an invoice for the following amendments that are to be made to the Bergenline Offering
Documents-

1) Drafting Amended and Restated Operating Agreement
2) Drafting amendment to PPM and Notice of Amendment to all Investors
3) Drafting Amended and Restated RC Agreement
4) Interfiling for Previously Filed Cases (including Engaging Investors for the Execution of the
Above Agreements)
5) Revision of I-526 Attorney Cover Letter

64.     Part of MSA Law, Shah, and Singh's representation of NRIA included the drafting
of legal documents such as the PPM for the Bergenline project and Confidential Offering
Memorandum for the 1300 Manhattan project. *See* Bergenline PPM at **Exhibit C**. *See also* 1300
Manhattan Confidential Offering Memorandum at **Exhibit D**. Between September 2018 and
September 2022, while simultaneously serving as counsel to NRIA, MSA Law was retained by
the Foreign National Investors as legal counsel for the preparation and filing of EB-5 Petitions
pursuant to investments made in the Bergenline and 1300 Manhattan projects. MSA Law, Shah,
and Singh's representation of the Foreign National Investors included, but was not limited to,

performing due diligence with respect to the NRIA Projects, assessing investors for EB-5 participation, managing EB-5 investments through the Regional Center, preparing legal filings in compliance with all applicable laws, and providing legal advice. Importantly, the Bergenline PPM and 1300 Manhattan Confidential Offering Memorandum contained numerous misrepresentations facilitated by MSA Law, Shah, and Singh and of which all three were fully aware including:[13]

a. "MSA shall not provide any investor with legal advice with respect to any investment in this Offering or in monitoring or protecting an investor's ongoing interest in the investment and will only serve to seek the immigration status that investment in this Offering makes possible." **Exhibit C** at 50.

b. "No offering of the Interests shall be made by any advertisement, article, or other communication published in a newspaper, magazine, or similar media, or broadcast over television, radio, or the internet, or at a seminar or meeting attended by persons who have been invited by a general solicitation or general advertising; and shall be made only pursuant to registration under the Securities Act, or in accordance with the provisions of Rule 903 of Regulation S, and/or pursuant to another available exemption from the registration requirements of the Securities Act." **Exhibit C** at 59.

c. "No portion of the subscription amount will be applied to offering costs or sales commissions or for administering the company or for operating the regional center (as hereinafter defined), including the payment of any supervisory service fee." **Exhibit D**, at iii.

d. "The Regional Center is owned and controlled by third parties unaffiliated with the Managing Member, the Company or the members of the Developer Group." **Exhibit D** at vi, 10, 13, 16, 23.

e. "The Company is not offering securities through this Memorandum or otherwise to any person or entity who does not provide information to it demonstrating that the person or entity meets the suitability standards for an investment in Series A Unites." **Exhibit D** at vi.

f. "The Administrative Fee proceeds will reimburse the Managing Member and the Company for a portion of the Offering expenses, including, without limitation, any legal, accounting, printing, escrow, and overseas marketing fees and expenses. *In no event will any part of the Subscription Amount be used to pay such fees and expenses*." (emphasis added) **Exhibit D** at 5.

---

[13] The alleged misrepresentations set forth in subparagraphs (f), (h), (i), and (j) are alleged on information and belief.

g. "Each Member will be allocated and entitled to receive a cumulative, non-compounded preferred return equal to 6.0% per annum of his or her unrecovered Subscription Amount (the "Preferred Return"), to be disbursed monthly." **Exhibit D** at 10.

h. "No portion of any subscriber's Subscription Amount will be used to pay the Regional Center Fee" **Exhibit D** at 11.

i. "The Company or the Managing Member will pay commissions or other fees to the Regional Center, Marketing Representatives, consultants, investment, and professional advisors, or other parties in connection with the Sale of Series A Units pursuant to this Offering. Any such commissions or other fees paid to any party in connection with the sale of Series A Units pursuant to this Offering will be paid (a) only if and to the extent permitted by applicable law, including U.S. securities laws, and (b) *from proceeds of the Administrative Fees or distributions received from the Equity Investment and not from the proceeds of any Member's Subscription Amount.*" (emphasis added) **Exhibit D** at 11.

j. "The Company has entered and will enter into contractual relationships with one or more firms located and conducting business entirely outside the United States to act as the Marketing Representatives to identify non-U.S. persons interested to acquire Series A Units in the Offering. *No portion of a Member's Subscription Amount will be used to cover such expenses.*" (emphasis added) **Exhibit D** at 47.

k. "In order for the Company to be entitled to rely on these exemptions from the registration requirements of the Securities Act, *the Offering must comply with certain requirements, including but not limited to the requirements that offers and sales be made outside the United States to non-U.S. Persons* within the meaning of Regulation S and that no direct selling efforts take place." (emphasis added) **Exhibit D** at 64.

65.     Between November 2018 and December 2019, MSA Law, Shah, and Singh knowingly filed EB-5 petitions with USCIS on behalf of the Foreign National Investors which did not satisfy the minimum investment threshold of $500,000 required under the EB-5 Program, despite the Foreign National Investors providing the minimum investment of $500,000 Defendants. Shah and Singh, as self-proclaimed expert practitioners in the EB-5 field, were aware that use of the minimum investment amount for any purpose other than investment in the EB-5 project decreases the minimum investment accordingly.

66.    To date, neither Shah, Singh nor MSA Law have been successful in securing any immigration benefits on behalf of the Foreign National Investors in connection with any offering affiliated with NRIA. To date, at least three NRIA related EB-5 petitions filed by MSA Law, Shah, and Singh have been denied by USCIS for failure to satisfy the minimum investment threshold.[14]

67.    On June 7, 2022, the Petition Date, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. As of the Petition Date, NRIA's Investors had claims for outstanding principal investments of at least $515 million.[15] The Liquidation Trust estimates that the Debtors' Available Cash and real estate assets will generate approximately $130-180 million in proceeds for Investors, leaving Investors with a loss of approximately $335-385 million.

68.    On June 21, 2022, just two weeks after the Petition Date, the New Jersey Bureau of Securities filed a letter response to oppose certain sales of properties and to inform the Court of NRIA's violations of antifraud provisions of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-52(a), (b), and (c), in connection with the offer and sale of securities in the Fund. *See* Letter to Honorable John K. Sherwood, U.S.B.J., *In re National Realty Investment Advisors, LLC*, Case No. 22-14539-JKS (Bankr. D.N.J. June 21, 2022) [Docket No. 60]. Attached to the New Jersey Bureau of Securities' letter response described above was a Summary Cease and Desist Order against the Fund, its general partner, NRIA, NRIA Capital Partners, Inc., NRIA Structured Credit Strategies, LLC, and four Fund officers (Salzano, Grabato, O'Brien, and Scuttaro, collectively, the "Respondents") based, in large part, on the violations described above. *See* Summary Cease and

---

[14] MSA Law, Shah, and Singh are appealing USCIS's denial for at least one of these petitions.
[15] Over $4 billion in claims have been asserted in 5,770 filed proofs of claims. *See* NRIA Omni Claims Docket. The Liquidation Trustee is in the process of reconciling the filed claims against investor and other Debtor records.

Desist Order, *In the Matter of National Realty Investment Advisors, LLC* (N.J. Bureau of Securities June 21, 2022) (the "Summary Order").

### D. Mona Shah & Associates, PLLC and its Principal, Mona Shah

69.     Salzano, Grabato, and their team operated the Debtors' business as a Ponzi scheme to defraud innocent Investors for the benefit of those in the NRIA inner circle, their insiders, affiliates, and others. Specifically, MSA Law, Mona Shah, and Rebecca Singh illegally profited from the Ponzi scheme run by Salzano, Grabato, and others, at the expense of, and at the detriment of, innocent Foreign National Investors.

70.     Shah and her law firm, MSA Law, went to great lengths to solicit foreign national investors for the NRIA Projects which included: promoting NRIA and Salzano on podcasts hosted by Shah, which were available in the United States through MSA Law's website and standard podcast platforms, on which Salzano spoke about the NRIA Projects; written articles promoting NRIA Projects on MSA Law's website; traveling to India to attend investor conferences with employees of NRIA to solicit investors; retaining marketing consultants and drafting promotional brochures; and retaining "headhunters" to obtain investors leads.

71.     MSA Law's podcast purports to be a "comprehensive," podcast about the EB-5 Program. *EB-5 Investment Voice Podcast*, MONA SHAH & ASSOCS. GLOB. https://mshahlaw.com/podcast/ (last accessed Dec. 5, 2023). The podcast's website describes the episodes as being "diverse," and a medium for discussing the EB-5 "program from a legal perspective and business development factors, as well as investor returns and residency considerations." *Id.*

72.     For example, on January 31, 2019, Shah and her law firm, MSA Law, released a podcast episode titled, "Cashing in On Private Equity Experience In EB-5 With Nicholas Salzano

Of NRIA." *See Cashing in on Private Equity Experience in EB-5 with Nicholas Salzano*, SPEAKER

https://www.spreaker.com/user/eb5investmentvoice/cashing-in-on-private-equity-experience-
?utm_campaign=episode-title&utm_medium=app&utm_source=widget (last accessed Dec. 4,

2023). MSA Law's blog post about that episode states, "Listen in to understand the benefits of

investing with Nick's firm and learn how NRIA maximizes returns for private equity and EB-5

investors alike." *Cashing in on Private Equity Experience in EB-5 with Nicholas Salzano of NRIA

– Episode 71*, MONA SHAH & ASSOCS. GLOB., https://mshahlaw.com/cashing-in-on-private-
equity-experience-in-eb-5-with-nicholas-salzano-of-nria/ (last accessed Dec. 6, 2023).

73.    On February 6, 2019, MSA Law published a blog post on their website titled "The

Rise Of Private Equity in EB-5 Projects With Nicholas Salzano Of NRIA," featuring information

about Nick Salzano and NRIA. Hermione Krumm*, The Rise of Private Equity in EB-5 Projects

with Nicholas Salzano of NRIA*, MONA SHAH & ASSOCS. GLOB. https://mshahlaw.com/rise-private-
equity-eb-5-projects-nicholas-salzano-nria/ (last accessed Dec. 4, 2023).

74.    In addition, Defendants promoted investing in NRIA through other means. For

example, on August 17, 2019, Shah sent an email to Nick Salzano highlighting her role, and by

extension MSA Law's role, in promoting NRIA:

**From:** mona <mona@mshahlaw.com>
**Sent:** Saturday, August 17, 2019 7:24 PM
**To:** Nicholas Salzano; Glenn La Mattina
**Cc:** Art Scutaro; Rebecca; shagufta; Anand Sinha; Hermione
**Subject:** Re: Queries for : 1300 Manhattan Avenue ANSWERS

Wow — really Nick? After all we have done!

3% is nothing for all the marketing and pushing we have done and for the investors we are now bringing in.

If you have switched RC then you will not be getting any further clients from us. Let's close out with what we have.

Kind regards
Mona


    -------- Original message --------
    From: mona <mona@mshahlaw.com>
    Date: 8/17/19 10:22 PM (GMT-05:00)
    To: Nicholas Salzano <nicholas@nria.net>, Glenn La Mattina <GLaMattina@nria.net>

    Cc: Art Scutaro <ascutaro@nria.net>, Rebecca <rebecca@mshahlaw.com>, shagufta
    <shagufta@mshahlaw.com>, Anand Sinha <anand@mshahlaw.com>, Hermione
    <hermione@mshahlaw.com>
    Subject: Re: Queries for : 1300 Manhattan Avenue ANSWERS

    Nick,
    There is a trust involved in this process. One simple example is how we have been marketing  NRIA in
    KSA. Today's, we have spent more thank 150k marketing in KSA (Saudi) which is only just starting to come
    back in the form of investors etc. we have given out NRIA information everywhere. We believed that we had
    a long term relationship with you.


        75.     Defendants' promotional activities included coordinating promotional events with

NRIA and traveling with NRIA employees to promote the NRIA Projects in India. On January 9,

2019, Shah and an employee of NRIA discuss a promotional event in Dubai with Shah suggesting

it would be better to "have a small seminar—exclusively for NRIA (we can throw in our name as

27

well).” *See* email between NRIA and Shah dates January 9, 2019, discussing a promotional event

in Dubai at **Exhibit H**.

|  |  |
|---|---|
| **From:** | mona <mona@mshahlaw.com> |
| **To:** | Glenn La Mattina <glamattina@nria.net> |
| **Cc:** | Nicholas Salzano <nicholas@nria.net>, Rebecca <rebecca@mshahlaw.com> |
| **Subject:** | Press Conference in Dubai |
| **Date:** | Wed, 9 Jan 2019 18:21:43 +0000 |
| **Importance:** | Normal |
| **Inline-Images:** | Outlook-1515024935.jpg |

Dear Glenn:
I understand that you want a press conference in Dubai -- we need to talk. The UAE have different rules, it is not like India. It is difficult to have a "press conference".
Alternatively, what would be better would be to have a small seminar --exclusively for NRIA ( we can throw in our name as well).

We held something similar last year. It cost us around $15 -- which included the press kit for people from the various news agencies, marketing/ invitations to direct investors  and the marketing / invitations for teh brokers, and of course teh hotel costs.
Please let me now.

76.     On at least one occasion, an NRIA employee and Singh traveled to India together,

upon information and belief, for the purpose of soliciting investments in the NRIA projects, as

showcased in the email below:

|  |  |
|---|---|
| **From:** | mona |
| **To:** | Poonam Bhuchar |
| **Cc:** | Sutapa Katari; Rebecca; Art Scutaro; Nicholas Salzano |
| **Subject:** | Re: EB-5 Introduction |
| **Date:** | Saturday, February 23, 2019 11:09:33 AM |

Yes — I am very flexible. It is not that late in India now. The only thing is that I prefer to speak with the investors directly. It is not the same when another attorney is on the phone.
Is there a particular reason why you want to be on the call?
Where are they located?
Our Rebecca is in Ahmedabad tomorrow with Glen then headed back to Mumbai for about 3 days.

Kind regards
Mona

77.     On June 19, 2018, Shah asked Nick Salzano to misrepresent the status of work at
1300 Manhattan to an investor, on information and belief, in order to induce the individual into
investing in 1300 Manhattan:

**From:** mona <mona@mshahlaw.com>
**Sent:** Tuesday, June 19, 2018 10:20 AM
**To:** Nicholas Salzano <nicholas@nria.net>; amy <amy@mshahlaw.com>; Rebecca
<rebecca@mshahlaw.com>
**Cc:** deepit_anand@yahoo.com
**Subject:** Re: REVISED ARTWORK : 1300 Manhattan Ave EB 5

Dear Nick:

One of our investors is interested in speaking with you / Deepit. We can set up a call today. We also need
to get moving on the project paperwork. Please do not state that the work has not begun as yet,
otherwise the client will be deterred.

Thanks,

Mona

*Mona Shah, Esq.*



78.     Shah engaged in further misrepresentations when she coached NRIA employees on
what to say to Foreign National Investors to induce them to close deals against the Foreign National
Investors' interests, asserting that "this worked for another project." *See* email between NRIA and
Shah dated July 1, 2019 at **Exhibit I**, in which Shah coaches an NRIA employee in how to induce
an investor to sign on more quickly:

**From:** mona <mona@mshahlaw.com>
**Sent:** Monday, July 01, 2019 3:07 PM
**To:** Glenn La Mattina <GLaMattina@nria.net>; Nicholas Salzano <nicholas@nria.net>

**Cc:** Rebecca <rebecca@mshahlaw.com>; shagufta <shagufta@mshahlaw.com>
**Subject:** Re: EB5 Project

Glenn-- we need your assistance for two of the cases-- both are confirmed and have signed the subscription agreements, but they are just taking far too long. We need someone from your company **to call and say that they will only be eligible for the 6% if they file within the next 2 weeks, otherwise it remains at 3%. (This worked for another project).**

79.     Similarly, on May 23, 2019, Shah engaged in misrepresentations when she reached out to NRIA to provide advance notice that a client "will try to approach you to lower the admin fees from $25K. They are already confirmed and not going anywhere, please do not promise anything." *See* email between Shah and NRIA dated May 23, 2019, at **Exhibit J**.

**From:** mona <mona@mshahlaw.com>
**To:** Glenn La Mattina <glamattina@nria.net>, Sutapa Katari <sutapa@mshahlaw.com>,
Brian Harrington <bharrington@nria.net>, "Nicholas Salzano" <nicholas@nria.net>
**Cc:** Rebecca <rebecca@mshahlaw.com>, shagufta <shagufta@mshahlaw.com>
**Subject:** Re: Sean Nagari and Family Visiting
**Date:** Thu, 23 May 2019 12:32:58 +0000
**Importance:** Normal
**Inline-Images:** image001.jpg; image002.jpg; image003.jpg

---

Dear Brian:

I met with the clients yesterday afternoon and will meet with them again this morning. First of all— I have
already requested this several times— please DO NOT discuss the administrative fee, especially when the
clients come through us. There is often a third party that we need to pay, and there is a ton of administrative
expenses that these fees cover. The fee in the documents is not $25,000 but $50,000. We lower it
accordingly.

Glen/ Nick— Preeti Goyal will try to approach you to lower the admin fees from $25k. They are already
confirmed and not going anywhere, please do not promise anything.

Yesterday's clients were impressed but have a little uncertainty as to their rights if and when you redeploy
their funds. I will discuss this with them today. I
Thank you.

> 80.    Notwithstanding the conflict of interest waiver that appeared in MSA Law's
Engagement Letter[16] and the NRIA Project documents, on information and belief, the Foreign
National Investors were not made aware of MSA Law, Shah, and Singh's actual legal and factual
conflicts of interest in their representation of the Foreign National Investors. MSA Law, Shah, and
Singh were deeply entangled with NRIA in "closing deals" with Foreign National Investors despite
their claiming independence from NRIA to those same Foreign National Investors, as Shah does
in the email below:

---

[16] Not all Foreign National Investors signed Engagement Letters with MSA Law.

**From:** mona <mona@mshahlaw.com>
**To:** Nicholas Salzano <nicholas@nria.net>, Art Scutaro <ascutaro@nria.net>
**Cc:** Rebecca <rebecca@mshahlaw.com>, Sutapa Katari <sutapa@mshahlaw.com>
**Subject:** Re: EB-5 Introduction FEEDBACK
**Date:** Mon, 25 Feb 2019 14:14:50 +0000
**Importance:** Normal
**Inline-Images:** image001.jpg; image002.jpg; Outlook-w5ulemeu.jpg

Dear Nick:
I just got off the phone with Poonam and the father of the client. Some feedback:
Initially only Poonam's agent in India was on the call --I insisted on speaking with either the father or the sons. The father was brought onto the call. I then spoke to him in detail. He expressed his satisfaction that there were so many layers of oversight (as he is investing $1m)--- as I explained how the RC process works and that we were independent to NRIA.
Art, this client is more or less closed.
I have to say that I found Poonam professional and more competent than Seema in matters of immigration law.
The evidence is always in the numbers!

81.     Upon information and belief, Shah failed to disclose her business and financial interests to the Foreign National Investors.

82.     Shah directed foreign nationals to invest in the NRIA Projects due to her preferential financial arrangements with NRIA.

83.     In fact, Shah further directed certain Foreign National Investors to Bergenline over 1300 Manhattan because of the increased affiliation fee and double per investor annual fee to be paid to Shah's Regional Center for Bergenline investments, which was not disclosed to the investors she solicited. *See* email between NRIA and Shah dated August 17, 2019, discussing a preference for Bergenline investments at **Exhibit K**. In this exchange with NRIA, Shah sent information about a potential investor in the EB-5 projects to NRIA. Shah states "He is only interested in 1300 Manhattan- can either of you get onto a call with him and **convince** him Bergenline is better." (emphasis added).

**From:** mona <mona@mshahlaw.com>

**Sent:** Saturday, August 17, 2019 4:19 PM

**To:** Glenn La Mattina <GLaMattina@nria.net>; Nicholas Salzano <nicholas@nria.net>

**Subject:** Fwd: Queries: 1300 Manhattan Avenue

This is one of our clients from Saudi Arabia (we have so many inquiries from there and it is amazing for private equity!)
He is only interested in 1300 Manhattan— can either of you get onto a call with him and convince him Bergenline is better.

Kind regards
Mona

84.    Similarly, on April 4, 2019, an employee of MSA Law reached out to NRIA regarding a potential investor "who is VERY  excited to go into 1300 Manhattan" but MSA Law was "trying to push him to go into Bergenline but he is being persistent."  Shah further responds to NRIA, "please meet with him and *persuade* him. His money is ready."  *See* email between NRIA and Shah  dated April 4, 2019, discussing preference for Bergenline investments at **Exhibit L**.

**From:** mona <mona@mshahlaw.com>
**To:** Nicholas Salzano <nicholas@nria.net>, Glenn La Mattina <glamattina@nria.net>
**Cc:** Rebecca <rebecca@mshahlaw.com>, Sutapa Katari <sutapa@mshahlaw.com>
**Subject:** Fw: Client Interested in 1300 Manhattan
**Date:** Thu, 4 Apr 2019 22:38:45 +0000
**Importance:** Normal
**Inline-Images:** Outlook-5c3z053y.jpg; Outlook-034ur0as.jpg

---

I just spoke again and said that the admin fee was $7,500 for Bergenline and $50k for 1300 M !!
Please meet with him and *persuade* him. His money is ready ( he is a direct MSA).

**From:** Sutapa Katari
**Sent:** Thursday, April 4, 2019 6:17 PM
**To:** Glenn La Mattina
**Cc:** mona; Rebecca
**Subject:** Client Interested in 1300 Manhattan

Dear Glenn,

We have a client by the name of Shalin Shah who is VERY excited to go into 1300 Manhattan. We're trying to push him to go into Bergenline but he is being persistent. I will coordinate with him and get back to you on details about visiting you all.

85.     In addition to the at least $8.5M in investments, on information and belief, NRIA paid the Regional Center, of which Shah is the owner and Managing Member, more than $660,000 in transaction-based compensation including affiliation, administrative, commissions, and annual fees pursuant to the Bergenline and 1300 Manhattan Sponsorship Agreements, which were not made evident to investors. *See* full summary of investments by the Foreign National Investors as set forth at **Exhibit A**.

86.     MSA Law, Shah, and Singh received at least $900,000 in total payments from NRIA for legal fees, affiliation fees, and investor fees. Over $230,000 of the total payments were paid to MSA Law, while the remaining approximately $660,000 was paid to the Regional Center.

87.     Further, even though the Limited Liability Company Operating Agreement of Bergenline Capital 4901 LLC ("Bergenline Operating Agreement") requires that Bergenline "shall

maintain its funds in one or more separate bank accounts . . . and shall not permit the funds of

[Bergenline] to be co-mingled in any fashion with the funds of another [person]," upon receipt of

Foreign National Investor funds, those funds were immediately transferred to NRIA and

comingled with other funds in NRIA's operating account, *See Bergenline Operating Agreement*,

at **Exhibit M**, §7.4,

88.     The NRIA Fraudulent Transfers to Defendants are, at their origin, Investor funds,

fraudulently obtained from the Debtors' sale and promotion of unregistered securities by

unregistered brokers, using false and misleading Private Placement Memoranda, with the material

aid and assistance of MSA Law, Shah, and Singh, who plainly benefitted from the Debtors' Ponzi

scheme.

89.     The Debtors were, at the time each Fraudulent Transfer was made, insolvent, as

such term is defined in 11 U.S.C. § 101(32) and were kept afloat and continued to operate solely

by misappropriating Investor funds—rather than from legitimately generated operating profits.

90.     Accordingly, by this Complaint, the Liquidation Trustee seeks to avoid and recover

all avoidable transfers made, obligations incurred, and payments made by the Debtors to or for the

benefit of one or more of the Defendants.

**E.  In addition to Evidence of Actual Fraud, Badges of Fraud and Facts Supporting a
    Direct Inference of Fraudulent Intent and Constructive Fraudulent Transfers Also
    Exists.**

91.     The Liquidation Trustee incorporates the prior allegations set forth above. The

fraud and other misconduct by MSA Law and Mona Shah, which were aided by the other

Defendants and were part of one fraudulent scheme, all to enrich the Defendants at the expense of

the Debtors' Estate and its creditors. Specifically, the siphoning of fees for Defendants' benefit,

Defendants' misrepresentations to induce the Foreign National Investors to invest with Debtors,

and Defendants' misrepresentations in drafting the offering documents, are all evidence of actual

fraud.

92.     Separately, there are also numerous badges of fraud and facts supporting a direct

inference of actual intent to hinder, delay, and defraud the Debtors' Estate and its creditors. For

example, and without limitation:

> a.   The Fraudulent Transfers were concealed; and

> b.   The Fraudulent Transfers were made while Salzano and his co-conspirators
>      operated the Debtors as a Ponzi scheme, and while the Debtors were insolvent.

93.     The fraud and other misconduct by MSA Law and Mona Shah, which were aided

by the other Defendants, were part of one fraudulent scheme that has continued after the Petition

Date, all to enrich the Defendants at the expense of the Debtors' Estate and its creditors.

## COUNT I—ACTUAL FRAUDULENT TRANSFERS
**Avoidance Pursuant To 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 544, and Applicable State
Law Including N.J.S.A. § 25:2-25(a)(1) and Recovery and Preservation of Same
Pursuant To 11 U.S.C. §§ 550 and 551
(Against All Defendants)**

94.     The Liquidation Trustee repeats and realleges each of the preceding paragraphs,

which are incorporated by reference as if set forth fully herein.

95.     The Liquidation Trustee seeks to avoid the Fraudulent Transfers, including those

set forth on **Exhibit A** and those to be discovered through litigation to each of the Defendants set

forth on **Exhibit A** and to recover and preserve the value thereof.

96.     Each of the Fraudulent Transfers was a transfer of property, or of an interest in

property, of the Debtors as set forth on **Exhibit A**.

97.     The NRIA Fraudulent Transfers were made to or for the benefit of MSA Law and/or

Mona Shah, and each of the Defendants are either initial, immediate, or mediate transferees of the

Fraudulent Transfers as set forth on **Exhibit A**.

98.    Each of the Fraudulent Transfers was made within either the two-year period prior to the Petition Date, the four-year period prior to the Petition Date, or the ten-year period prior to the Petition Date.

99.    As is set forth in detail above, each of the Fraudulent Transfers was made with actual intent to hinder, delay, or defraud creditors because, among other things, they were made in furtherance of and perpetuated the Ponzi scheme. Further, in the context of a Ponzi scheme, intent to hinder, delay, or defraud creditors is presumed from the nature of the scheme itself.

100.    The Defendants did not take any of the transfers in good faith.

101.    At the time of each of the Fraudulent Transfers, NRIA and the Fund, as applicable, each had at least one general unsecured creditor holding an allowable claim who, but for the Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover the Fraudulent Transfers, including but not limited to the Internal Revenue Service.

102.    Accordingly, Plaintiff is entitled to a judgment (1) avoiding the Fraudulent Transfers under section 548(a)(1)(A) of the Bankruptcy Code and/or section 544(b) of the Bankruptcy Code and New Jersey Revised Statutes § 25:2-25(a)(1), and (2) recovering and preserving all such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

**COUNT II—CONSTRUCTIVE FRAUDULENT TRANSFERS**
**Avoidance Pursuant to 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544(b), and Applicable State Law Including N.J.S.A. 25:2-25(a)(2) and 25:2-27(a)**
**(Against All Defendants)**

103.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

104.    The Liquidation Trustee seeks to avoid the Fraudulent Transfers including those set forth on **Exhibit A** and those to be discovered through litigation, to each of the Defendants and to recover and preserve the value thereof.

105.    Each of the Fraudulent Transfers was a transfer of property or of an interest in property, of the Debtors as set forth on **Exhibit A**.

106.    The NRIA Fraudulent Transfers were made to or for the benefit of MSA Law and/or Mona Shah, and each of the Defendants are either initial, immediate, or mediate transferees of the Fraudulent Transfers as set forth on **Exhibit A**.

107.    Debtors did not receive reasonably equivalent value in exchange for the Fraudulent Transfers.

108.    Each of the Fraudulent Transfers was made within either the two-year period prior to the Petition Date, the four-year period prior to the Petition Date, or the ten-year period prior to the Petition Date.

109.    On the dates that each of the Fraudulent Transfers were made, Debtors were (1) insolvent or became insolvent as a result of such transfer; (2) engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with Debtors was an unreasonably small capital; and/or (3) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

110.    At the time of each of the Fraudulent Transfers, NRIA and the Fund, as applicable, each had at least one general unsecured creditor holding an allowable claim who, but for the Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover the Fraudulent Transfers, including but not limited to the Internal Revenue Service.

111.    Accordingly, Plaintiff is entitled to a judgment (1) avoiding the Fraudulent Transfers under section 548(a)(1)(B) of the Bankruptcy Code and/or section 544(b) of the Bankruptcy Code and New Jersey Revised Statutes §§ 25:2-25(a)(2) and 25:2-27(a), and (2)

recovering and preserving all such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

## COUNT III: SECURITIES FRAUD
## (Against MSA Law and Mona Shah)

112.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

113.    The Private Placement Memoranda offered to NRIA investors, and drafted with the assistance of MSA Law and Mona Shah, were securities within the meaning of N.J.S.A. 49:3-49(m).

114.    In violation of N.J.S.A. 49:3-52(a), Mona Shah and MSA Law each jointly and severally acted to employ a device, scheme, or artifice to defraud NRIA's investors in connection with the offer, sale, or purchase of securities in which MSA Law and Mona Shah drafted the PPMs to present investors with the offering opportunity, induced the Foreign National Investors to invest in the opportunity and, then, acting in concert with NRIA insiders, diverted the Foreign National Investors' funds to NRIA.  NRIA recorded the diverted Foreign National Investors' funds as long-term liabilities on their books and almost immediately, upon receipt of each investment, paid commissions in the amount of $5,000 to the Regional Center from the same account that received the investor's diverted funds. Mona Shah also helped to attract investors to NRIA. Such violations of N.J.S.A. 49:3-52(a) are specifically alleged throughout this Complaint and include, but are not limited to, the following, in addition to those misrepresentations and omissions stated in ¶ 64 above:

        a.  Misrepresenting that, "no sales commissions or any other form of compensation will be paid to the Company or the Managing Member or any of their respective principals, Managing Members or employees for introducing the Company to investors or negotiating the sale of any

interests."[17] When in fact the Regional Center received about $660,000 in transaction-based compensation from NRIA that was concealed from investors.

b. Misrepresenting and omitting material information in connection with the offer and sale of securities regarding the joint operations of NRIA with MSA Law including, as to the EB5 investors, that the Investor's funds would be diverted to NRIA's operating account where they would be commingled with other investors funds and misapplied to fund NRIA's expenses;

c. Misrepresenting and omitting to disclose to prospective and actual EB5 Investors that in March 2018 the SEC issued an order to cease and desist to Edwin Shaw, a company co-owned by Shah and ordered that company to pay a total of $544,744 in disgorgement, prejudgment interest, and civil monetary penalty for violations of the broker dealer registration provisions of federal securities law in connection with the sale of EB5 securities;

d. Omitting to disclose that from June 2014 to December 2018, Mona Shah, MSA Law, and her co-defendant in that matter, offered and sold approximately $49.5 million of securities in an unregistered, nonexempt securities offering to at least ninety-nine (99) investors seeking unconditional permanent residency via the EB-5 Program and that, as of the date of the NRIA offerings in 2018 and 2019 the USCIS had not approved any of those investors for unconditional permanent residency pursuant to the EB-5 Program.

e. Purposefully misstating the status of work on NRIA projects in order to induce the Foreign National Investors into investing with NRIA; and

f. Purposefully concealing MSA Law's and Mona Shah's involvement with NRIA.

115.    In violation of N.J.S.A. 49:3-52(b), MSA Law and Mona Shah each jointly and severally acted to prepare and assist in the preparation of documents and communications provided to NRIA investors in connection with the offer, sale, or purchase of securities that contained untrue statements of material facts, in addition to those misrepresentations and omissions stated in ¶ 64 above, including but not limited to:

a. The Bergenline PPM;

---

[17] Bergenline PPM P. 58; Plan of Distribution.

b.  The 1300 Manhattan Confidential Offering Memorandum; and

c.  The fact that, under the terms of the PPMs, the Foreign National Investors were promised annual returns of 6%, but the PPMs never disclosed that these payments would be made from the funds provided by other investors.

116.  In violation of N.J.S.A. 49:3-52(b), MSA Law and Mona Shah each jointly and severally acted to prepare and assist in the preparation of documents and communications provided to NRIA investors in connection with the offer, sale, or purchase of securities that omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, in addition to those misrepresentations and omissions stated in ¶ 64 above, including but not limited to:

a.  Failure to disclose that NRIA was not in a position to honor the guarantees to investors if called upon to do so;

b.  Failure to disclose that despite multiple red flags, Defendants did not conduct reasonable diligence to determine that an investment in NRIA (and affiliated entities) was suitable for investors seeking permanent residence through the EB5 program;

c.  Failure to fully disclose the risks of the securities, including the additional risks to the Foreign Investors' investments and their eligibility to qualify for unconditional permanent residency by placing the control of their investment in Salzano's hands;

d.  Failure to disclose that investors' funds would be commingled in NRIA's operating accounts and their funds would be misapplied to pay NRIA's expenses including payments to other investors;

e.  Failure to disclose that NRIA paid the Regional Center transaction-based incentive compensation in connection with their sales of the EB5 securities making the Regional Center an unregistered broker dealer in violation of federal and state securities law.

f.  Failure to disclose that the securities were required by law to be registered but were not in fact registered;

g.  Failing to disclose that the source of potential profits was other investor funds; and

    h.  Failing to disclose Salzano's regulatory past despite his leadership position within NRIA.

117.    In violation of N.J.S.A. 49:3-52(c), Mona Shah and MSA Law each jointly and severally engaged in acts, practices, or courses of business which operated as a fraud or deceit in connection with the offer, sale, or purchase of securities through continuing to participate in the development, offering, and sale of investments to NRIA investors knowing and understanding the misrepresentations and omissions contained in communications and documents provided to such investors.

### <u>COUNT IV—AIDING AND ABETTING SECURITIES FRAUD</u>
**Violations of Applicable State Law Including N.J.S.A. §§ 49:3-52 and 49:3-71
(Against MSA Law and Mona Shah)**

118.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

119.    Any person violates the New Jersey Uniform Securities Act ("<u>NJUSA</u>") if, for example, they:

    a.  Offer, sell, or purchase a security by employing any device, scheme, or artifice to defraud; or

    b.  Offer, sell, or purchase a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person; or

    c.  Engage in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing or selling securities, or who, for compensations and as a part of a regular business, issues or promulgates analyses or reports concerning securities (i) in willful violation of the NJUSA or of any rule or order promulgated pursuant to the NJUSA, or (ii) employs any device, scheme or artifice to defraud the other person or engages in any act, practice or course of business or conduct which operates or would operate as a fraud or deceit on the other person, is liable as set forth in subsection (c) of this section.

N.J.S.A. § 49:3-71(a)(3)-(5).

120.    Additionally, N.J.S.A. § 49:3-71(d) provides as follows:

Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions, every employee of such a seller or investment adviser who materially aids in the sale or in the conduct giving rise to the liability, and every broker-dealer, investment adviser, investment adviser representative **or agent who materially aids in the sale or conduct are also liable jointly and severally with and to the same extent as the seller or investment adviser**, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts under paragraphs (1) through (5) of subsection (a) of this section which give rise to liability.

(Emphasis added).

121.    MSA Law and Mona Shah provided legal "services" to NRIA and its affiliates since approximately 2018, receiving over $900,000 in compensation along the way in the form of legal fees, affiliation fees, and annual investor fees.

122.    MSA Law and Mona Shah were agents of NRIA.

123.    MSA Law and Mona Shah materially aided the sale of securities and conduct of NRIA in violating the NJUSA by promoting NRIA investments and other conduct facilitating the public dissemination of false and misleading advertisements inducing the public to invest in NRIA's Ponzi scheme. Through its podcast and other mediums, MSA Law and Mona Shah were advertising publications as to the value of securities and the advisability of investing in NRIA in willful violation of the NJUSA. Those advertisements were also deployed as a device and scheme to defraud unknowing investors to invest in Bergenline and 1300 Manhattan.

124.    Therefore, through their services provided to NRIA, MSA Law and Mona Shah materially participated in facilitating, marketing, and protecting the sale of securities, as well as other related conduct, for personal gain—aiding and abetting not only defrauding of Investors, but also in violation of the NJUSA.

125.    On information and belief, MSA Law and Mona Shah knew of the untruths and omissions made in NRIA promotions. Evidence of MSA Law's and Mona Shah's knowledge of the untruths and omissions, includes but is not limited to, the activities described in ¶ 77.

126.    On information and belief, MSA and Mona Shah could have, in the exercise of reasonable care, known of the existence of facts under N.J.S.A. § 49:3-71(a)(1)-(5) giving rise to liability under the NJUSA.

127.    As a result of MSA and Mona Shah's material promotion and aiding of Debtors in selling securities, for significant compensation, Investors suffered financial detriment.

128.    Accordingly, the Liquidation Trustee is entitled damages pursuant to N.J.S.A. § 49:3-71.

## COUNT V – FRAUD
### (Against MSA Law and Mona Shah)

129.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

130.    MSA Law and Mona Shah made misrepresentations to the public, including Investors in NRIA and the Fund, and misrepresentations to the Foreign National Investors, regarding NRIA and the Fund. These misrepresentations include, but are not limited to, the misrepresentations described in ¶¶ 14, 15, 16, 64, 78 and 79.

131.    The misrepresentations made by MSA Law and Mona Shah were both intentional and material. For example, MSA Law and Mona Shah engaged in the "kickback scheme," described in ¶ 14, despite representing to the Foreign National Investors that MSA Law did not earn commission fees. In addition, throughout the life of the scheme, MSA Law and Mona Shah materially misrepresented that the Foreign National Investors would earn high returns by investing with NRIA, thereby inducing the Foreign National Investments to invest with NRIA. *See* ¶ 15.

44

Further, MSA Law and Mona Shah engaged in material misrepresentations by representing to the

Foreign National Investors that their investments met the minimum EB-5 investment requirements,

when in fact they did not. *See* ¶ 14.

132.    On information and belief, MSA Law and Mona Shah made those material

misrepresentations with knowledge of their falsity or with reckless disregard as to the falsity of

the statements made with the intent that others would reasonably and justifiably rely upon the

misrepresentations and invest in NRIA and/or the Fund, resulting in damages.

133.    Through its role providing legal services to Foreign National Investors and to

NRIA, MSA Law and Mona Shah intended other persons to reasonably rely on the

misrepresentations in order to bring new Investors into NRIA's Ponzi- scheme.

134.    Investors, and therefore the Liquidation Trustee, suffered losses, thus resulting in

damages.

135.    Accordingly, the Liquidation Trustee is entitled to a judgment that MSA Law and

Mona Shah committed fraud and the damages resulting therefrom in an amount to be proven at

trial but reasonably expected to exceed millions of dollars.

## <u>COUNT VI – AIDING AND ABETTING FRAUD</u>
### (Against MSA Law and Mona Shah)

136.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs,

which are incorporated by reference as if set forth fully herein.

137.    As discussed at length above, Debtors' insiders leveraged NRIA and the Fund as a

means to fraudulently absorb more than $600 million dollars from  approximately 2,000 individual

investors—many of whom were elderly and, in some instances, invested their life savings with

NRIA and/or Bergenline and 1300 Manhattan.

138.    NRIA materially misrepresented the rates-of-return available on its investments and knew or had reason to know that those statements were false.

139.    For example, because neither NRIA nor the Fund generated enough cash from operations to cover distributions made to Investors, NRIA manipulated the Fund's financial statements and financial information included within marketing materials to mislead Investors.

140.    NRIA intended for investors to rely on those statements, and the Investors reasonably relied on those materially false statements.

141.    By virtue of the acts and omissions described herein, Debtors and NRIA demonstrably committed a fraud against Investors. Among other things, NRIA knowingly manipulated financial statements and financial information and actively worked to conceal the fact that NRIA had little revenue to properly compensate Investor distributions.

142.    NRIA's record clearly shows that it intended for Investors to rely on these fraudulent statements, and unfortunately, nearly 2,000 Investors reasonably relied on those materially fraudulent and misleading statements.

143.    But the Debtors did not commit their fraud alone. The Debtors' fraud was aided and abetted by others, including MSA Law and Mona Shah. But for MSA Law's and Mona Shah's conduct, particularly as it related to providing legal services to Foreign National Investors and encouraging Investors to invest with NRIA, and specifically Bergenline and/or 1300 Manhattan, the Ponzi scheme would not have been as expansive and destructive.

144.    On information and belief, MSA Law and Mona Shah engaged in a wrongful act that caused the Investors to suffer an injury by losing investments by rendering advertising services to NRIA containing false information.

145.    For example, Mona Shah, in prepping Salzano to speak with a potential investor,
Mona Shah asked Salzano not to "state that the work has not yet begun," on 1300 Manhattan in
order to, on information and belief, induce that potential investor into investing. *See* ¶ 77.

146.    Further, Mona Shah, through MSA Law, promoted investing in NRIA. *See* ¶ 74,
65, and 76. On information and belief, MSA Law and Mona Shah were aware of the role they
played in this illegal activity at the time they assisted NRIA.

147.    On information and belief, MSA Law and Mona Shah knowingly and substantially
assisted NRIA in its fraud.

148.    Evidence that MSA Law and Mona Shah were knowing participants in the scheme
and substantially assisted NRIA in its fraud includes, but is not limited to, the activities described
in ¶ 14, namely that Mona Shah, a self-purported expert on the EB-5 Program, diverted funds out
of the minimum investment amount in contravention of the minimum investment required by the
EB-5 Program.

149.    As a result of the legal services provided by MSA Law and Mona Shah, including
MSA Law's and Mona Shah's conduct promoting NRIA to the Foreign National Investors and to
a general audience through the podcast, the Investors, and therefore the Liquidation Trustee,
suffered an injury through funds lost to the Ponzi scheme engaged in by NRIA and aided and
abetted by MSA Law and Mona Shah.

150.    Accordingly, the Liquidation Trustee is entitled to a judgment that MSA Law and
Mona Shah aided and abetted in fraud by the Debtors and are entitled to damages in an amount to
be determined at trial but reasonable expected to exceed millions of dollars.

## COUNT VII – FRAUDULENT INDUCEMENT
### (Against Mona Shah and MSA Law)

151.   The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

152.   As set forth in the preceding paragraphs, MSA Law and Mona Shah engaged in material misrepresentations as to presently existing or past facts. These material misrepresentations include, but are not limited to, those described in ¶¶ 15, 16, 77, 78, and 79.

153.   On information and belief, MSA Law and Mona Shah made those material misrepresentations with knowledge of their falsity of the statements. Evidence of MSA Law and Mona Shah's knowledge that these misrepresentations were false include, but is not limited to, that described in ¶ 77.

154.   Through its role providing legal services to Foreign National Investors and to NRIA, MSA Law and Mona Shah intended other persons to reasonably rely on the misrepresentations in order to bring new Investors into NRIA's Ponzi- scheme.

155.   The Foreign National Investors relied on MSA Law's and Mona Shah's misrepresentations by investing in NRIA and/or the Fund and by hiring MSA Law and Mona Shah to serve as their legal counsel for the EB-5 Program.

156.   Investors, and therefore the Liquidation Trustee, suffered losses, thus resulting in damages.

157.   Accordingly, the Liquidation Trustee is entitled to a judgment that MSA Law and Mona Shah committed fraud and the damages resulting therefrom in an amount to be proven at trial but reasonably expected to exceed millions of dollars.

## COUNT VIII – UNJUST ENRICHMENT
### (Against All Defendants)

158.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

159.    In the alternative, the Trustee asserts claims for unjust enrichment against each of the Defendants.

160.    Each of the Defendants was enriched and received economic benefits without justification as a result of, but not limited to, the Fraudulent Transfers set forth on **Exhibit A** to this Complaint.

161.    Defendants have unjustly retained the sums received by each of them to the detriment of the Debtors' Estate and its creditors.

162.    The Debtors were impoverished as a result of the Fraudulent Transfers. Without limitation, the Debtors did not receive a reasonably equivalent value for any of the Fraudulent Transfers. Further, the conduct alleged herein facilitated and perpetuated the Ponzi scheme, which resulted in substantially all of the Debtors' assets being syphoned off and their estates being left with millions of dollars in unpaid claims and other liabilities.

163.    There is a direct relationship between the enrichment of the Defendants and the impoverishment of the Debtors' Estates, as the Fraudulent Transfers were made directly from the Debtors' bank account to or for the benefit of one or more of the Defendants.

164.    There is no justification at all for the Fraudulent Transfers, which were the product of self-dealings and other misconduct and are not supported by reasonably equivalent value.

165.    Accordingly, the Liquidation Trustee is entitled to a judgment against each of the Defendants compelling them to disgorge and return the amounts by which they were unjustly enriched.

## COUNT IX – CONSTRUCTIVE TRUST
### (Against All Defendants)

166.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

167.    A constructive trust is an equitable remedy to redress a wrong. When one party, by virtue of fraudulent, unfair, or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty, a constructive trust will be imposed.

168.    As set forth in detail in this Complaint, MSA Law, Mona Shah, and others—acting on their own behalf and on behalf of each of the Defendants—engaged in conduct that was fraudulent, unfair, and/or unconscionable.

169.    Each of the Defendants was directly and materially enriched by virtue of such fraudulent, unfair, and/or unconscionable conduct.

170.    Each of the Defendants received the Fraudulent Transfers by fraud.

171.    Accordingly, each of the Defendants is the voluntary trustee of the Fraudulent Transfers, as applicable, for the benefit of the Liquidation Trustee, in its capacity as Liquidation Trustee of the AIRN Liquidation Trust.

172.    Accordingly, the Liquidation Trustee seeks the entry of a judgment (a) declaring a constructive trust with respect to the Fraudulent Transfers and (b) directing each of the Defendants, as applicable, to convey to the Liquidation Trustee the Fraudulent Transfers, as to each Defendant, in the amounts set forth on **Exhibit A** to this Complaint.

## COUNT X - ACCOUNTING
### (Against All Defendants)

173.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

174.     An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of judgment for the amount ascertained to be due to either as a result.

175.     As set forth in detail in this Complaint, Defendants failed to maintain complete and accurate books and records of the Debtors' transfers to and transactions with the Defendants.

176.     On information and belief, the Defendants possess financial books and records relating to the Debtors.

177.     The Liquidation Trustee requires and is entitled to an accounting setting forth all of the Debtors' transfers to and transactions with the Defendants.

178.     Accordingly, the Liquidation Trustee seeks the entry of a judgment directing the Defendants to perform a full and complete accounting of all of the Debtors' transfers to or for the benefit of the Defendants for the period of January 1, 2016 through the date of entry of judgment.

## COUNT XI – BREACH OF FIDUCIARY DUTY
### (Against MSA Law, Mona Shah, and Rebecca Savita Singh)

179.     The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

180.     Between 2018 and 2022, the Foreign National Investors hired Defendants to serve as their legal representation while navigating the EB-5 Program.

181.     The Foreign National Investors entrusted their financial assets to Defendants, relying on the Defendants' representations that they would invest those assets to make a qualifying investment for the EB-5 Program.

182.     The Foreign National Investors trusted MSA Law, Mona Shah, and Rebecca Savita Singh to hold their communications with MSA Law, Mona Shah, and Rebecca Savita Singh confidential.

183.    The Foreign National Investors compensated MSA Law, Mona Shah, and Rebecca Savita Singh in exchange for legal representation.

184.    Defendants' legal representation of the Foreign National Investors and control over the Foreign National Investors' assets gave rise to a fiduciary duty on the part of MSA Law, Mona Shah, and Rebecca Savita Singh to the Investors.

185.    Under their fiduciary duty, MSA Law, Mona Shah, and Rebecca Savita Singh were obligated to deal fairly and honestly with the Foreign National Investors; to act with loyalty; to avoid conflicts of interest; to maintain confidentiality; and to manage investments according to each Investor's best interests.

186.    MSA Law, Mona Shah, and Rebecca Savita Singh breached their fiduciary duties to the Foreign National Investors by failing to act with loyalty; avoid conflicts of interests; maintain confidentiality; and manage each Foreign National Investor's investments for the best interest of each Foreign National Investor.

187.    As a direct and proximate result of the Defendants' breaches of fiduciary duties, the Foreign National Investors suffered damages and are entitled to such damages in an amount to be proven at trial but reasonably expected to exceed millions of dollars.

## COUNT XII – LEGAL MALPRACTICE
### (Against MSA Law, Mona Shah, and Rebecca Savita Singh)

188.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

189.    Plaintiff, in its capacity as Liquidation Trustee of the AIRN Liquidation Trust established pursuant to the Plan [Docket No. 3256] and the Confirmation Order, which has been assigned and, as of the Effective Date of the Plan, holds the claims of Contributing Investors (as

that term is defined herein and in the Plan), including claims held by the Foreign National Investors.

190.    MSA Law was the law firm specifically retained by the Foreign National Investors to assist them in obtaining EB-5 visas. At all times mentioned herein, Mona Shah, Rebecca Savita Singh, and others at MSA Law held themselves out as attorneys offering professional services to the public and to Investors. For example, MSA Law's website describes the firm as employing "leading practitioners," in the EB-5 field. In addition, MSA Law's podcast purports to discuss the EB-5 Program from a "legal perspective," while also discussing "investor return and residency considerations."

191.    Mona Shah, Rebecca Savita Singh, and MSA Law agreed to represent the Foreign National Investors and had an attorney-client relationship with them. Mona Shah, Rebecca Savita Singh, and MSA Law therefore had a duty to exercise reasonable care in their representation of the Investors.

192.    Fifteen of the Foreign National Investors also signed Engagement Letters with MSA Law. As such, MSA Law, and its agents Mona Shah and Rebecca Savita Singh, had duties to perform legal services with reasonable care.

193.    Investors compensated Mona Shah, Rebecca Savita Singh, and MSA Law in exchange for receiving competent legal representation.

194.    Mona Shah, Rebecca Savita Singh, and MSA Law therefore owed the Foreign National Investors a duty of competent representation.

195.    Mona Shah, Rebecca Savita Singh, and MSA Law breached the duty owed to the Foreign National Investors by misleading Investors about the nature of their investments and by

representing NRIA and the Investors concurrently, creating a conflict that was not waivable by the Foreign National Investors.

196.     Mona Shah's, Rebecca Savita Singh's, and MSA Law's conduct and performance of their duties, including and without limitation as alleged above, falls below the ordinary and reasonable skill and knowledge commonly held by members of the legal profession.

197.     As a direct and proximate cause of Mona Shah's, Rebecca Savita Singh's, and MSA Law's legal malpractice, the Foreign National Investors suffered damages and are entitled to such damages in an amount to be proven at trial but reasonably expected to exceed millions of dollars.

### COUNT XIII – LEGAL MALPRACTICE
### (Against MSA Law, Mona Shah, and Rebecca Savita Singh)

198.     The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

199.     Plaintiff, in its capacity as Liquidation Trustee of the AIRN Liquidation Trust established pursuant to the Plan [Docket No. 3256] and the Confirmation Order, which has been assigned and, as of the Effective Date of the Plan, holds the claims of Contributing Investors (as that term is defined herein and in the Plan).

200.     At all times mentioned herein, Mona Shah, Rebecca Savita Singh, and others at MSA Law held themselves out as attorneys offering professional services to the public, Investors, and NRIA.

201.     MSA Law was the law firm specifically retained by NRIA on or about May 2018 to secure investments in the Bergenline and 1300 Manhattan projects and to assist NRIA in drafting, amending, and finalizing project documents, thereby creating an attorney-client relationship.

202.    For example, MSA Law, Mona Shah, and Rebecca Savita Singh drafted an amendment to the PPM and other legal documents for the Bergenline project. *See* **Exhibit C**.

203.    MSA Law, Mona Shah, and Rebecca Savita Singh also assisted in drafting the Confidential Offering Memorandum for the 1300 Manhattan project. *See* **Exhibit D**.

204.    As such, MSA Law, Mona Shah, Rebecca Savita Singh had a duty to exercise reasonable care in their representation of NRIA.

205.    NRIA compensated MSA Law, Mona Shah, and Rebecca Savita Singh in exchange for receiving competent legal representation.

206.    Nevertheless, between September 2018 and September 2022—concurrent with their representation of NRIA—MSA Law, Mona Shah, and Rebecca Savita Singh also represented the Foreign National Investors, including directing those investments to NRIA.

207.    Mona Shah, Rebecca Savita Singh, and MSA Law breached the duty owed to NRIA by representing NRIA and the Foreign National Investors concurrently, creating a conflict that was not waivable by NRIA.

208.    Mona Shah's, Rebecca Savita Singh's, and MSA Law's conduct and performance of their duties, including and without limitation as alleged above, falls below the ordinary and reasonable skill and knowledge commonly held by members of the legal profession.

209.    As a direct and proximate cause of Mona Shah's, Rebecca Savita Singh's, and MSA Law's legal malpractice, the Contributing Investors (as the term is defined herein and in the Plan) suffered damages and are entitled to such damages in an amount to be proven at trial but reasonably expected to exceed millions of dollars.

## RESERVATION OF RIGHTS

210.    During the course of this proceeding, the Liquidation Trustee may learn through discovery or otherwise of additional claims or causes of action that are actionable under the provisions of the Bankruptcy Code or other applicable law. The Liquidation Trustee reserves all rights to amend this original Complaint to, among other things, (i) modify of and/or revise to Defendants' names; (ii) add defendants; and/or (iii) add claims or causes of action, if applicable (collectively, the "Amendments"), that may become known to the Liquidation Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to the filing of this original Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Liquidation Trustee respectfully requests this Court enter judgment in Liquidation Trustee's favor and against each of the Defendants as follows:

a.    The entry of a judgment in favor of the Liquidation Trustee and against each of the Defendants avoiding and recovering the actual Fraudulent Transfers, in an amount to be determined at trial;

b.    The entry of a judgment in favor of the Liquidation Trustee and against each of the Defendants avoiding and recovering the constructive Fraudulent Transfers, in an amount to be determined at trial;

c.    The entry of judgment in favor of the Liquidation Trustee and against MSA Law and Mona Shah on the Liquidation Trustee's New Jersey Securities Law claim for damages therefor in an amount to be determined at trial;

d.    The entry of judgment in favor of the Liquidation Trustee and against MSA Law and Mona Shah on the Liquidation Trustee's aiding and abetting New Jersey Securities Law claim and damages therefor in an amount to be determined at trial;

e.    The entry of judgment in favor of the Liquidation Trustee and against MSA Law and Mona Shah on the Liquidation Trustee's fraud claim and for damages therefor in an amount to be determined at trial;

f.   The entry of a judgment in favor of the Liquidation Trustee and against MSA Law and Mona Shah on the Liquidation Trustee's aiding and abetting fraud claim and for damages therefor in an amount to be determined at trial;

g.   The entry of judgment in favor of the Liquidation Trustee and against MSA Law and Mona Shah to the extent that they engaged in fraudulent inducement at the expense of the Investors and for damages therefor in an amount to be determined at trial;

h.   The entry of judgment in favor of the Liquidation Trustee and against each of the Defendants to the extent that they were unjustly enriched at the expense of Debtors and damages therefor in an amount to be determined at trial;

i.   The entry of a judgment imposing a constructive trust upon each of the Defendants with respect to the Fraudulent Transfers in the amount set forth on Exhibit A and the amounts to be established during discovery, as to each Defendant;

j.   The entry of a judgment requiring all Defendants to perform and accounting, as set forth above;

k.   The entry of a judgment in favor of the Liquidation Trustee and against MSA Law, Mona Shah, and Rebecca Savita Singh on the Liquidation Trustee's breach of fiduciary duty claim and for damages therefor in an amount to be determined at trial;

l.   The entry of a judgment in favor of the Liquidation Trustee and against Mona Shah, Rebecca Savita Singh, and MSA Law on the Liquidation Trustee's legal malpractice claim and for the damages therefor in an amount to be determined at trial;

m.   The entry of a judgment in favor of the Liquidation Trustee and against Mona Shah, Rebecca Savita Singh, and MSA Law on the Liquidation Trustee's legal malpractice claim and for the damages therefor in an amount to be determined at trial;

n.   An award of reasonable attorneys' fees and costs;

o.   An award of pre- and post-judgment interest; and

p.   Such additional relief as this Court deems just and equitable.

[SIGNATURE ON FOLLOWING PAGE]

Dated: December 29, 2023

**ICE MILLER LLP**

 */s/ Louis T. DeLucia*
Louis. T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
1500 Broadway
Suite 2900
New York, NY 10036
Phone: (212) 835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

Aneca E. Lasley (admitted pro hac vice)
250 West Street
Suite 700
Columbus, OH 43215
Phone: (614) 462-1085
Aneca.lasley@icemiller.com

*Counsel to the AIRN Liquidation Trust Co.,
LLC, in its capacity as Liquidation Trustee of
the AIRN Liquidation Trust*